# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| _____ ) | |
| JOHNELL MIDDLETON, ) | |
| ) | |
| JACORI HODGES, ) | |
| ) | |
| COREY HOLBROOKS, on behalf ) | |
| of themselves and others similarly ) | |
| situated, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | **CIVIL ACTION** |
|     v. ) | |
| ) | NO. 5:21-CV-_____ |
| TIMOTHY WARD, Commissioner, ) | |
| Georgia Department of Corrections, ) | **COMPLAINT** |
| ) | |
| AHMED HOLT, Assistant ) | CLASS ACTION |
| Commissioner, Georgia Department ) | |
| of Corrections, ) | |
| ) | |
| ROBERT TOOLE, Field Operations ) | |
| Director, Georgia Department of ) | |
| Corrections, ) | |
| ) | |
| STAN SHEPARD, Southeast Regional ) | |
| Director, Georgia Department of ) | |
| Corrections, ) | |
| ) | |
| JACK SAULS, Assistant ) | |
| Commissioner, Health Services ) | |
| Division, Georgia Department of ) | |
| Corrections, ) | |
| ) | |
| IOANNIS IOANNOU, Statewide ) | |
| Mental Health Director, Georgia ) | |
| Department of Corrections, ) | |

TREVONZA BOBBITT, Warden                )
Georgia State Prison,                    )
                                         )
CHARLES SPINN, Deputy Warden             )
of Security, Georgia State Prison,       )
                                         )
JOSH WICKER, Deputy Warden               )
of Security, Georgia State Prison,       )
                                         )
DEIDRA EDWARDS, Deputy Warden            )
of Care and Treatment, Georgia State     )
Prison,                                  )
                                         )
VIKKI IRWIN, Deputy Warden of            )
Administration, Georgia State Prison,    )
                                         )
JUANITA SHARPE, Tier II Program          )
Unit Manager, Georgia State Prison       )
                                         )
      Defendants.                        )
_____ )

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

JURISDICTION AND VENUE ...........................................................5

PARTIES............................................................................................5

    I.    Plaintiffs..................................................................................5

    II.    Defendants ...............................................................................6

        A.    The Central Office Defendants .....................................6

        B.    The GSP Defendants ....................................................8

ALLEGATIONS OF FACT .................................................................10

    I.    People in GSP's segregation units are subjected to solitary confinement under conditions of severe isolation and deprivation ............................................................................10

        A.    GSP's segregation units are designed to isolate people from human contact..........................................10

        B.    People in GSP's segregation units are confined to rat-, mouse-, and roach-infested cells with defective plumbing and an unbearable stench of human waste ....................................20

        C.    People in GSP's segregation units are often kept in dirty, vermin-infested holding cages for several days without access to food, water, or the bathroom............................26

    II.    Indefinite solitary confinement in deplorable conditions deprives people in GSP's segregation units of basic human needs and subjects them to a risk of serious harm ....................................30

        A.    There is a consensus among state, federal, and international authorities that solitary confinement causes harm..........................................30

B.    Solitary confinement and harsh conditions in GSP's segregation units have led to numerous deaths by suicide ............35

III.    People with serious mental illness in GSP's segregation units experience particularly acute harm from their indefinite solitary confinement without minimally adequate mental health care.................39

A.    People with serious mental illness in GSP's segregation units experience a worsening of their conditions...........................39

B.    People with serious mental illness in GSP's segregation units are deprived of mental health care .........................................42

C.    People with serious mental illness in GSP's segregation units are often confined to the prison's Acute Care Unit in repulsive conditions ......................................................................45

IV.    Defendants have long been on notice that conditions in GSP's segregation units cause serious psychological harm ................................49

A.    Conditions in GSP's segregation units are obviously harmful ..................................................................................................49

B.    Department auditors have repeatedly warned defendants about dangerous conditions and inadequate mental health care in GSP's segregation units ......................................................51

C.    Defendants have been subject to federal litigation regarding conditions similar to those that persist in GSP's segregation units.............................................................................56

D.    Plaintiffs' counsel placed Defendants on notice of unconstitutional conditions in GSP's segregation units, but Defendants failed to take reasonable steps to ameliorate them..........................................................................58

CLASS ACTION ALLEGATIONS ........................................................................60

A.    Principal Class.................................................................................61

    B.      Psychiatric Disability Subclass ........................................................63

CLAIMS FOR RELIEF ..........................................................................65

PRAYER FOR RELIEF ..........................................................................70

## COMPLAINT

Plaintiffs Johnell Middleton, Jacori Hodges, and Corey Holbrooks respectfully file this complaint for injunctive and declaratory relief on behalf of themselves and a class of similarly situated people.  Plaintiffs allege the following:

## INTRODUCTION

1.      This is an action to stop prison officials from isolating people in deplorable conditions.

2.      Plaintiffs are men held in the "Tier II Program" and other solitary confinement housing units at Georgia State Prison (GSP).[1]

3.      Over 70 percent of the approximately 300 men in GSP's Tier II Program, and many men in the prison's other solitary confinement units, experience serious mental illness.  They are kept in conditions so harsh and isolating—and they receive such inadequate mental health care—that self-injury, violence, and suicide are common.  At least 12 men have committed suicide at GSP in the last two years.  Many of these men were held in solitary confinement at the time of their deaths.

4.      According to Georgia Department of Corrections ("the Department") policy, the Tier II Program is a 270-day "incentive program" used to encourage "appropriate adjustments" so that people "may be returned to a general population

---

[1] Throughout this complaint, the solitary confinement housing units are also referred to as "isolation units" or "segregation units."

housing assignment." In practice, people are assigned to in-cell lockdown in the program indefinitely for months or years, despite the serious health consequences of long-term solitary confinement.

5.     The Tier II Program at GSP typically houses people in dormitories G-1 through G-4, K-1, and K-2. People assigned to the Tier II Program are confined for 23 to 24 hours per day on average, alone or with a cellmate, in cells that isolate them and deprive them of sensory stimuli. Solid metal doors and padlocked cell flaps impede communication between cells. Narrow windows covered with plexiglass and grated metal allow men to view only a sliver of sky.

6.     The Tier II Program's phases vary in the restrictions they impose, but all are characterized by prolonged in-cell isolation and lack of human interaction. "Recreation," when it occurs, consists of being placed in a metal cage for, at best, up to five hours per week. However, the prison is so short-staffed that recreation often does not occur at all, and men go weeks or months without leaving their cells for any reason except to shower. The supposed "privileges" afforded to men in the Tier II Program—like occasional phone calls and restricted, no-contact visitation—afford few opportunities for meaningful interaction.

7.     Men in other solitary confinement units at the prison are held in substantially similar conditions, with little to no access to programming, outdoor time, or human connection. As with assignment to the Tier II Program, assignment

to GSP's other solitary confinement units is indefinite in duration and often lasts for many months or years.

8.      GSP lacks the staff to run the prison in a humane manner.  With a correctional staff vacancy rate of more than 70 percent, there are simply too few officers at GSP to run the facility safely and responsibly.

9.      Staffing is so inadequate that officers fail to provide for people's basic needs, such as taking men to the showers or the infirmary.

10.      Men in GSP's solitary confinement units are often left for extended periods of time in temporary holding areas—such as locked shower stalls or telephone-booth-sized cages—without food, water, or access to a toilet.

11.      Men left for hours in locked shower stalls pass out and vomit from excessive heat exposure.  Men abandoned in holding cages for hours or days defecate and urinate on the floor.

12.      Due to the harsh conditions in GSP's solitary confinement units, people with serious mental illness regularly experience psychiatric crises.  They cycle between their cells and the prison's Acute Care Unit (ACU), a psychiatric isolation unit.  Men are purportedly sent to the ACU for mental health treatment, but little in the way of treatment occurs there.  Instead, a person in psychiatric crisis can expect to be held naked, for days or weeks, with no toothpaste, soap, or

toilet paper.  The ACU cells are infested with rats and their walls and surfaces are often smattered with feces and blood.

13.     As a result of Defendants' policies and practices, people in GSP's solitary confinement units are utterly isolated, many for years on end, with little if any meaningful human interaction.

14.     Defendants' use of prolonged, isolated confinement deprives Plaintiffs and others of basic human needs, creates a substantial risk of serious mental and physical harm, and violates basic standards of decency.

15.     Defendants are aware of the conditions that exist in GSP's solitary confinement units and have been repeatedly informed by incarcerated people, auditors, and Plaintiffs' counsel that those conditions present a substantial risk of serious harm.  Defendants have failed to take reasonable steps in response.  People at the prison continue to deteriorate, and in many cases die, as a result of Defendants' conscious indifference.

16.     Plaintiffs bring this action on behalf of themselves and similarly situated people to end Defendants' unlawful practices and vindicate their rights under the Eighth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action under 28 U.S.C. § 1331,

because it raises claims arising under the United States Constitution and 42 U.S.C.

§ 1983.

18.     This judicial district is an appropriate venue under 28 U.S.C.

§ 1391(b)(1), because all Defendants are Georgia residents and at least one

Defendant resides in the Macon Division of the Middle District of Georgia, and

under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to

this action occurred in the Macon Division of the Middle District of Georgia.

## PARTIES

### I.     Plaintiffs

19.     Plaintiff Johnell Middleton is a 41-year-old man who is serving a life

sentence.  He has been incarcerated in the Department since 2004, and at GSP

since around December 2019.  He is currently housed in K-2, a Tier II Program

dormitory.  Mr. Middleton is classified as Mental Health Level II by the

Department.

20.     Plaintiff Jacori Hodges is a 25-year-old man who is serving a prison

sentence in the Department.  He has been incarcerated for more than four years.

Since around October 2020, he has been held in administrative segregation in the

Tier II Program housing units at GSP.  He is currently housed in K-2, a Tier II

Program dormitory.

5

21.     Plaintiff Corey Holbrooks is a 31-year-old man who is serving a prison sentence in the Department.  He has most recently been incarcerated since 2017.  Prior to his current incarceration, Mr. Holbrooks was incarcerated in the Department off and on from 2008 to 2015.  He has been incarcerated at GSP since on or around September 17, 2020.  He is currently housed in G-1, a Tier II Program dormitory.

## II.     Defendants

22.     There are two categories of Defendants in this case.  The first category consists of officials assigned to the Department's Central Office in Forsyth, Georgia, consisting of Defendants Ward, Holt, Toole, Shepard, Sauls, and Ioannou (collectively referred to as "the Central Office Defendants").  The second category consists of officials assigned to GSP, consisting of Defendants Bobbitt, Spinn, Wicker, Edwards, Irwin, and Sharpe (collectively referred to as "the GSP Defendants").

### A.     The Central Office Defendants

23.     Defendant Timothy Ward is sued in his official capacity as Commissioner.  As Commissioner, Defendant Ward has final authority over the management of all prisons in the Department, including GSP.  He also oversees the Department's four divisions: Facilities, Administration & Finance, Health Services, and Inmate Services.

24.     Defendant Ahmed Holt is sued in his official capacity as the Assistant

Commissioner in charge of the Department's Facilities Division.  As Assistant

Commissioner of Facilities, Defendant Holt is responsible for the direct

supervision of all persons incarcerated by the Department, including all people

incarcerated at GSP.  Defendant Holt manages the Facilities Division under

authority delegated to him by Defendant Ward.

25.     Defendant Robert Toole is sued in his official capacity as the Director

of the Department's Field Operations Division.  As Director of Field Operations,

Defendant Toole is responsible for overseeing the daily operations of all state

facilities in the Department, including GSP.  Defendant Toole manages Field

Operations under authority delegated to him by Defendants Ward and Holt.

26.     Defendant Stan Shepard is sued in his official capacity as the

Southeast Regional Director for the Department.  As Southeast Regional Director,

Defendant Shepard is responsible for overseeing the management of 14 facilities

throughout the southeast region of Georgia, including GSP.  Defendant Shepard

manages these prisons under authority delegated to him by Defendants Ward, Holt,

and Toole.

27.     Defendant Jack Sauls is sued in his official capacity as the Assistant

Commissioner in charge of the Department's Health Services Division.  As

Assistant Commissioner of Health Services, Defendant Sauls is responsible for

overseeing the delivery of health care services, including medical care and mental health care, to all persons incarcerated by the Department, including all people incarcerated at GSP.  Defendant Sauls also oversees system-wide health care functions such as training and policy development.  Defendant Sauls manages the Health Services Division under authority delegated to him by Defendant Ward.

28.    Defendant Ioannis Ioannou is sued in his official capacity as the Department's Statewide Mental Health Director.  As Statewide Mental Health Director, Defendant Ioannou is responsible for planning, developing, and implementing mental health-related policies and procedures for the Department; organizing, directing, and coordinating the delivery of mental health services in all Department facilities that provide those services, including GSP; and overseeing and evaluating all mental health programs in the Department, including all mental health programs at GSP.  Defendant Ioannou's authority is delegated to him by Defendants Ward and Sauls.

## B.    The GSP Defendants

29.    Defendant Trevonza Bobbitt is sued in his official capacity as Warden of GSP.  As Warden, Defendant Bobbitt has final authority over the conditions of confinement at GSP and supervisory authority over all officers assigned to the prison.  Defendant Bobbitt is responsible for overseeing all incarcerated people and staff at GSP.

8

30.     Defendant Charles Spinn is sued in his official capacity as Deputy Warden of Security at GSP.  As Deputy Warden of Security, Defendant Spinn has supervisory authority over all security staff members at GSP and is responsible for overseeing the security and living conditions of all incarcerated people at GSP.

31.     Defendant Josh Wicker is sued in his official capacity as Deputy Warden of Security at GSP.  As Deputy Warden of Security, Defendant Wicker has supervisory authority over all security staff members at GSP and is responsible for overseeing the security and living conditions of all incarcerated people at GSP.

32.     Defendant Deidra Edwards is sued in her official capacity as Deputy Warden of Care and Treatment at GSP.  As Deputy Warden of Care of Treatment, Defendant Edwards is responsible for overseeing the daily operation of medical, mental health, education, and counseling services at GSP.

33.     Defendant Vikki Irwin is sued in her official capacity as Deputy Warden of Administration at GSP.  As Deputy Warden of Administration, Defendant Irwin is responsible for overseeing the business office, property and supply operations, and the food services department at GSP.

34.     Defendant Juanita Sharpe is sued in her official capacity as the Tier II Program Unit Manager at GSP.  As Tier II Program Unit Manager, Defendant Sharpe is responsible for the care, secure confinement, and living conditions of all people incarcerated in the Tier II Program at GSP.

9

# ALLEGATIONS OF FACT

I.   **People in GSP's segregation units are subjected to solitary confinement under conditions of severe isolation and deprivation.**

   A.   **GSP's segregation units are designed to isolate people from human contact.**

35.   GSP is a prison facility in Reidsville, Georgia, housing approximately 1,400 people.  The prison was constructed in the 1930's and was the subject of extensive litigation, from the 1970's onward, concerning unconstitutional conditions of confinement.

36.   The Department designates GSP a special mission facility because it specializes in housing people with mental illness, who make up more than 50 percent of the prison's population.

37.   GSP has approximately 36 dormitories, six of which house people in a long-term administrative segregation regime called the Tier II Program.  About 300 people are held in GSP's Tier II housing units.

38.   According to policy, the Tier II Program lasts for a minimum of 270 days, divided into three 90-day phases.  In practice, however, minor rule infractions can result in a person being summarily returned to the most restrictive phase.  Many people also languish in the final phase of the program, with no notice of when they will be returned to the general population.  As a result, most people

remain in the Tier II Program much longer than 270 days, and some remain for additional months or even years.

39.     The Tier II Program housing units are divided into two buildings: G Building and K Building.  G Building holds four Tier II dormitories—G-1, G-2, G-3, and G-4—each of which contains between 26 and 28 two-person cells.  K Building holds two Tier II dormitories—K-1 and K-2—each of which contains approximately 26 single-person cells.[2]

40.     Each cell in the Tier II housing units measures approximately eight feet by ten feet.

41.     GSP's Tier II Program segregation cells are specially designed to isolate people by depriving them of sensory stimuli and restricting their movement. Cell doors are made of solid metal.  The doors have two small openings—one "tray box," though which officers pass meal trays to incarcerated people, and one "flap," through which officers place men in handcuffs.  The tray boxes are locked.  In some Tier II dormitories, the flaps are sealed by padlocks.  Narrow cell windows are about eight inches wide and are covered in plexiglass and a layer of perforated metal.

---

[2] In recent months, many people assigned to the Tier II Program have also been placed in other dormitories, such as K-3, K-4, and the DE dormitories.  The prison has also begun isolating some individuals who are not assigned to the Tier II Program in dorms G-3 and G-4.

42.     People in the Tier II Program take all meals alone in their cells.  Food portions for people in the Tier II Program are significantly smaller than those served to the general population.  Many men in Tier II are not permitted to purchase supplemental food.  As a result, numerous men in the Tier II Program have lost significant amounts of weight and feel constantly hungry.

43.     Each phase of the Tier II Program has certain restrictions on property, visitation, phone calls, and other conditions.  None of these restrictions applies to people in the prison's general population, who have consistent access to telephone calls, showers, and time out of their cells.

44.     Phase One is the most restrictive phase of the Tier II Program.  Apart from a few state-issued items, people in Phase One are not allowed any personal property, including books, and they do not have access to the prison commissary, except to purchase legal materials.  People in Phase One are confined to their cells for an average of 23 to 24 hours per day.  They are permitted one, 15-minute phone call per month and one, non-contact visit per month.

45.     The next phase is Phase Two.  People in Phase Two are not permitted personal property, except for a few hygiene items.  Like men in Phase One, people in Phase Two are confined to their cells for about 23 to 24 hours per day.  They are allowed up to two, 15-minute phone calls and two, non-contact visits per month.

46.     The final phase is Phase Three.  People in Phase Three have limited access to personal property and some, restricted access to the prison commissary. Men in Phase Three are also confined to their cells for between 23 and 24 hours per day.  They are allowed up to three, 15-minute phone calls and three, non-contact visits per month.

47.     Although the limited privileges described above are available in theory, in practice, most men in the Tier II Program and other segregation units do not have access to phone calls[3] or visitation.[4]

48.     People in the Tier II Program remain in their cells almost all the time for months or years.  Although prison policy requires that men in the Tier II Program be allowed at least five hours of out-of-cell recreation every week, the policy is not carried out in practice.  In reality, many men are let out of their cells for exercise less than once per month.  Others are denied any out-of-cell time at all, apart from showers and the rare medical or legal visit.  Some men in the Tier II Program have not been outside for periods of six months or one year.  This degree

---

[3] Phone privileges are often not available in practice.  The telephones in certain dormitories are inoperable, and even in dormitories with working telephones, many men are unable to access them due to chronic understaffing.  In addition, telephone calls are costly for families; many men come from families that can rarely, if ever, afford to pay for calls.

[4] Visitation is not available in practice to most people in the Tier II Program.  GSP is in a rural area inaccessible to family members on a limited income who may live hundreds of miles away. Visits are further limited because Tier II Program visitation occurs during the week, when family members are working, rather than on weekends, when visitation occurs for the general population. Many men do not have family to visit them at all.

of in-cell isolation is extreme, both in the Georgia Department of Corrections and as compared to other state prison systems.

49.     "Recreation," when it occurs, consists of temporary confinement to an outdoor, steel cage surrounded by metal siding.  The cages for some buildings are not much wider than a man's arm span.  For exercise, people pace a few feet, back and forth, or jump in place.  Men who have cellmates share the same small outdoor cage for recreation.

50.     Men in the Tier II Program do not have access to programming to provide human interaction or mitigate the effects of isolation.  Those in the most restrictive phase, Phase One, are supposed to receive so-called "in-cell programming" after five weeks in the program.  In fact, most men in Phase One receive no programming at all.

51.     Men in certain program phases are, by policy, supposed to have access to a tablet with a few games and videos, to be played or viewed alone in their cells.  In practice, however, many people do not have tablet access.  Some were never given a tablet.  Others cannot access stations (also called "kiosks") to charge or maintain their tablets because the prison is too understaffed to transport them.

52.     No group programming has been available in more than a year for men in any Tier II Program phase.[5]  This was true even before the Department suspended group programming during the COVID-19 pandemic.  Lack of access to rehabilitative programming impedes people in the Tier II Program from obtaining parole.  Classes that are mandatory for parole eligibility are not offered in Tier II.

53.     Men in all phases of Tier II are prohibited from attending religious services with other people.  Prison policy specifically limits their religious activity to "individually engag[ing] in religious practices in their assigned cells or by their assigned beds."

54.     Without access to programming, religious services, phone calls, or time out of their cells, most men in the Tier II Program spend their days sleeping, pacing, and staring at the wall.

55.     Although policy requires that men in every phase of the Tier II Program be evaluated every 90 days to determine if they may move from a more restrictive to a less restrictive phase of the program, many men do not receive the required 90-day reviews.  These men remain in their assigned phases for prolonged periods of time.

---

[5] Even the "Offenders Under Transition," or "O.U.T." program—a behavior modification program that is allegedly required for men on Tier II status to progress off the tier and into general population—has, in practice, not been available to people in Tier II at GSP for more than a year.

56.     While assigned to Tier II, people in more advanced phases may be summarily returned to Phase One for minor infractions such as banging on a cell door or holding open a tray flap.  Some people are repeatedly required to restart the program and thus spend lengthy spans of time in more restrictive phases.

57.     Men in GSP's other segregation dormitories experience substantially similar conditions to those in the Tier II Program housing units.  People in all of GSP's isolation units are confined to small, eight-by-ten-foot cells with almost no access to out-of-cell time, outdoor recreation, or programs.  And, no matter the dormitory, GSP's isolation units are chronically and dangerously understaffed.

58.     GSP has one of the highest officer vacancy rates among Georgia prisons, at just over 70 percent.  Put another way, GSP employs well under half the number of officers needed to run the prison.  When officers do not come to work, the prison is even more understaffed than its vacancy rate would imply.

59.     Particularly at night and on weekends, the isolation units lack officer supervision.  It is not uncommon for men to see no or few officers after 9:00 p.m., and no or few officers on Saturdays and Sundays.

60.     Because the prison is so understaffed, officers often fail to perform rounds in the dormitories, including the 15-minute and 30-minute checks required by prison policy.  If officers make rounds at all, they do so irregularly, and often not more than once every five to six hours.

61.     Most weeks, there are not enough officers present in the isolation dormitories to take people to the showers without stranding them there for hours at a time.  On days when the prison is especially understaffed, officers simply forgo taking men to the showers, to medical appointments and, on occasion, to their legal visits.  These deprivations exacerbate the men's isolation.

62.     Persistent understaffing has contributed to self-injury, suicide, violence, and homicide among people housed in solitary confinement.  The epidemic of suicides at GSP is described in section II(B) below.  In addition, the following, recent deaths have occurred:

    a.  Raul Garcia died in G-2, a Tier II dormitory, on or around April 21, 2020.  When he was removed from his cell, his body was covered in blood.[6]

    b.  Al Mapp was found dead in his cell in K-2, a Tier II dormitory, on September 11, 2020.  The cause of his death is presently unknown to Plaintiffs.  In the day preceding Mr. Mapp's death, another man in his dormitory called out to him repeatedly to check on him, but Mr. Mapp

---

[6] Mr. Garcia is one of many men who have died by homicide or suspected homicide at GSP in the last four years, including the following men: John Burke (July 5, 2017), Stephen Garrard (July 13, 2018), Keith London (October 19, 2018), Adrian White (December 3, 2019), Joctavious Newsome (November 3, 2020), Demetrius Stubbins (December 21, 2020), and Christopher DeWayne Mathis (February 26, 2021).

did not respond.  Officers did not discover Mr. Mapp until they came to the dormitory to take people to the showers.

c.  Brandon Peters was found dead in G-3, a Tier II dormitory, on November 23, 2020.  Other incarcerated people reported that, in the week leading up to his death, Mr. Peters had been throwing up blood, complaining of blood in his stool, and attempting, without success, to get medical attention.

d.  Christopher Mathis was killed in G-3, a Tier II dormitory, on February 26, 2021.  Mr. Mathis was assaulted overnight, between 6:00 p.m. and 6:00 a.m., when there were no officers in the dorm.  Officers arrived the following morning and removed his body from the cell.

e.  Calvin Lewis was found dead in his cell in K-2, a Tier II dormitory, on May 5, 2021.  On or around May 4, the hot water pipe in Mr. Lewis's cell burst, and his room flooded with water.  Prison logbooks confirm that, the following morning at 6:22 a.m., an officer "noted flooding in the lower hall outside K2 dormitory."  Because the officer was single-handedly in charge of two buildings, K South and K North, he wrote that he would "not be entering the dorms unless an OIC [officer in charge] g[a]ve [him] a direct order to do so."  Two hours

18

later, Mr. Lewis was found dead on the floor of his cell.  Other men in

the dormitory saw his body removed from the cell, covered in gashes.

f.   A few weeks later, on May 25, 2021, in the same Tier II Program

dormitory, Christopher Ward died in his cell in what Department

records refer to as a "fire incident."  Mr. Ward lit a fire in his cell after

being denied food.  Although the officer overseeing rounds in the

dormitory that evening saw smoke emanating from Mr. Ward's cell,

he did not take immediate steps to put out the fire.  Mr. Ward was

later found dead on the floor of his cell.

63.   Because officers are frequently absent in prison housing units, people

who are injured or ill are often left without necessary attention for extended

periods of time.  Men with seizure disorders are left to seize alone in their cells.

Men with mental illness cut themselves and are left to bleed.  Other examples from

GSP's solitary confinement units include the following:

a.   On or around April 25, 2020, a man in a neighboring cell told K.J. that

he felt feverish, and the man's roommate screamed that he was

coughing up blood.  Other men in the dorm began shouting for officer

assistance, but none arrived for nearly three hours, after which the

man was hospitalized.

b. K.M. reports that an older man exhibiting symptoms of possible COVID-19 was left in his cell for nearly 24 hours after falling and injuring himself.  Unable to stand, the man soiled himself and was eventually found on the ground crying, lying in a pool of water from his leaking sink.

c. In October 2020, R.S. had a heart attack in his cell in a general population dormitory.  It took officers nearly 25 minutes to respond.  When he returned to GSP after being hospitalized, R.S. was placed in a filthy, flooded cell in a Tier II Program dorm in K Building.  On several occasions, he lost consciousness and woke in a pool of water on the floor.

64.     Serious medical, mental health, and other emergencies, including fires, are a daily facet of life at GSP, and in the solitary confinement units specifically.  In many instances, no officer is present or reachable during these emergencies.

**B.      People in GSP's segregation units are confined to rat-, mouse-, and roach-infested cells with defective plumbing and an unbearable stench of human waste.**

65.     Men in GSP's solitary confinement units are isolated in cells unfit for human habitation.

20

66.     The cells are infested with rats, mice, and cockroaches.  The vermin infestation is chronic, longstanding, and known to Defendants.

67.     It is common for men in GSP's solitary confinement cells to see more than 10 rats crawl across their floors, lockers, sinks, toilets, and beds in a single day.  The rats enter the cells through vents, holes in the wall, and the small space between the cell doors and the floor.

68.     When meals are left to sit in the solitary confinement dormitories before and after distribution, rats crawl on the men's trays.

69.     Rats emerge in greater numbers at night.  They crawl on people while they eat and while they sleep.  They find their way into people's shoes and clothing.

70.      Men hear the sound of rats squealing through the vents, preventing them from sleeping.

71.     Due to the chronic rat infestation, many men experience the constant sensation of rats sitting or crawling on their bodies.

72.     Men in GSP's solitary confinement units use what few tools they have to mitigate the rat infestation, stuffing towels under the doors and on top of vents or capturing live rats in pillowcases and bottles.

73.     Roaches and mice are just as prevalent.  In many cells, there are roaches all over the floor, the wall, and the metal bunk.  When A.P. lived in a

21

segregation unit, for example, there was a hole in his metal bunk, where cockroaches congregated.

74.     The cells in the solitary confinement dormitories emit a foul smell of human waste.  In many units, toilet flushing is controlled by correctional officers. When officers are not present, urine and feces accumulate, creating a terrible stench.

75.     Some men have experienced nausea and vomiting while waiting up to 24 hours for officers to flush the feces in their toilets.  Without the ability to flush their own toilets, people resort to using towels and pillows as plungers.  Some men cover their toilets with blankets to contain the stench of feces.

76.     Tap water in the solitary confinement units smells and tastes of excrement.  Many men avoid drinking water from their sinks because of the putrid smell.

77.     Some cells in the solitary confinement units have broken plumbing fixtures.  In these cells, toilet water and waste leak onto the floor, and mold grows on the walls.  Other cells have leaking pipes, and water smelling of sewage seeps through the walls.

78.     For three months in the fall of 2020, D.D. was confined to a cell in dorm G-3 with a leaking toilet, a broken sink, and an inoperable light.  Because the toilet leaked every time it was flushed, there was a standing puddle of water and

urine on the floor.  The sink was also broken, so D.D. often lacked water to drink or wash his hands.  A man in a neighboring cell passed him small cups of water through a hole in the wall between their cells.  Because the light did not work and little light otherwise entered the cell, D.D. spent his days in darkness.[7]

79.    For about two weeks in October and November 2020, R.S. was held in a filthy, vermin-infested cell in K Building.  Although R.S. was not assigned to the Tier II Program, he was placed in this cell—a quarantine cell—after testing positive for COVID-19 at a hospital.  The cell was covered with roaches, the walls were mold-infested, and R.S. had no running water.  When other men in the dorm took showers, his cell flooded.

80.    For around five years while living in the Tier II Program dormitories, M.H. cycled between cells with no running water, no working heater, no light, and toilets that did not flush.  He also lived in cells with dried blood and feces smeared on the walls.

81.    For about one week in or around February 2020, many men in G Building experienced persistent flooding in their cells.  Sewage water entered the cells through the small openings between the cell doors and the floor, and the entire dorm smelled of human waste.  Medical staff declined to enter the dorm on

---

[7] It is not uncommon for men in isolation dormitories to live in cells with no light or power.  For about a month in the fall of 2020, for example, V.E. did not have any light in his room.  Other men have experienced medical distress after being unable to access power for their breathing machines.

account of the flooding, so one man went without his seizure medication for seven days.  He experienced multiple seizures that caused him to lose consciousness and wake up on the ground, soaked in sewage water.

82.     For about one month in December 2020, another man lived in a rat-, roach-, and mouse-infested cell in G Building with a toilet that did not flush.  To rid the toilet of his waste, the man poured water into the toilet and used an empty chips bag to push his feces down the tank.

83.     Men in GSP's isolation units have no or severely limited access to cleaning products to sanitize their cells.  One man, for example, did not receive any cleaning supplies for six months.  Another man received disinfectant for his cell only three times during his 18 months in solitary confinement.  A third man was offered no more than five opportunities to clean his cell during a three-year period.  A fourth man was offered only three opportunities to clean his cell in over a year.

84.     Without access to cleaning supplies, many men resort to using their state-issued body soap to clean the floors and walls of their cells.  Because the men are given limited soap, many men do not have enough soap to clean their bodies and their cells.

85.     Showers in GSP's isolation units are also unsanitary.  The stalls are covered in mildew, mold, fruit flies, and dead roaches.  Others are smattered with

24

urine, feces, and hair and are left uncleaned for weeks. Sometimes, officers feed incarcerated people in the showers, so the stalls are strewn with leftover food.

86. Men in GSP's isolation units are often abandoned in these filthy stalls for hours at a time, after officers escort them to the showers and then fail to return.

87. Because controls for the showers are located outside the stalls, the water continues to run when officers are not present. The water can be scalding hot, and the men cannot adjust either the stream or the temperature from inside the stalls. Some men have experienced dizziness and vomiting after being left in hot showers for several hours.

88. There is one flap on each metal shower stall door. Some officers allow the men to open the flaps for air, but others lock the flaps from outside the stalls. When the flaps are locked, steam and hot water overtake the showers, making it difficult to breathe.

89. M.H. was once left in a shower with a locked flap in dorm K-2 for almost two hours. He was left standing in an uncomfortably hot stream of water until an officer returned. He was faint from the heat, and his skin burned.

90. K.J. was also abandoned in a hot shower in a Tier II Program dorm for nearly two hours while an officer responded to an incident in another building. The water was so hot that K.J. vomited. He had to be taken to the medical unit for treatment.

91.     Because of the filthy conditions and the risk of being left for hours in steaming shower stalls, many men simply avoid the showers altogether.  Instead, they bathe as best they can using the sinks in their cells.

92.     According to standard operating procedures, people in segregation units at GSP are permitted three showers per week.  In practice, however, the prison is too understaffed to provide showers on a regular schedule.  The men may only shower when there are enough officers present to escort them.

93.     On average, men in GSP's isolation units are permitted to shower only one to two times per week.  On some occasions, showers are provided at the beginning of the week, and then not again until a week later or more.

94.     Some men in GSP's isolation units have been denied showers for weeks at a time.  One man was denied a shower for 11 days.  Another man was denied a shower for 14 days.  A man held in the psychiatric crisis unit, or ACU, was denied a shower for seven weeks, despite his repeated requests to be allowed to bathe.

C.     **People in GSP's segregation units are often kept in dirty, vermin-infested holding cages for several days without access to food, water, or the bathroom.**

95.     When men in GSP's solitary confinement units are moved from one dorm to another, or when there are insufficient beds or cells available to house

them in the dormitories or the ACU, prison staff often place them in small, metal holding cages.

96.     These cages are located at the back of some of the dormitories in G Building, as well as in dormitories E-3 and E-4.  Similar cages are or have recently been located in the ACU and the infirmary.

97.     The holding cages are about the size of a telephone booth and are too small to accommodate almost any movement.  Men cannot lie down in the cages. They can only stand upright or sit on a small stool or bench.

98.     Although the cages are intended for temporary confinement, many men have been held in the cages for prolonged periods of time.  During their confinement, they are often deprived of food, water, and access to the bathroom.

99.     In August 2020, K.J. observed a young man confined to a holding cage at the back of dormitory G-2.  For several days, the young man slept on a small bench in the cage, while rats crawled on the floor near him.  K.J. heard the young man crying at night and repeatedly beating on the bars of the cage.  Without access to a toilet, the young man urinated and defecated on the floor.  Sometimes, orderlies gave the young man a blanket to cover up the layers of feces and urine on the ground.

100.   Other incarcerated men in the dormitory asked officers to remove the young man from the cage and place him in a cell.  Officers responded that it was

the unit manager's responsibility to authorize his removal from the temporary holding cage.

101.   Many other men in GSP's solitary confinement units have been held for extended periods of time in the small holding cages in substantially similar conditions.

102.   From September 11 to September 25, 2020, J.A. was held in a holding cage in his dormitory, where he had been taken to use the dorm kiosk.  For 14 days, he was not removed from the cage to shower.  He was forced to urinate and defecate on the floor or in plastic bags.

103.   M.H. was held in a holding cage in the medical unit three times— twice for 18 hours and once for an entire weekend, from a Friday to a Monday. Throughout the weekend, he was not fed.  He repeatedly banged on the bars of the cage, asking to be given something to eat or drink.  His requests were ignored.

104.   In or around September 2020, J.H. was held in a small holding cage for about three days.  During this period, he was fed two sandwiches and given a small container in which to urinate.  He suppressed the urge to defecate, because he knew he would have to sleep near his own excrement if he defecated in the cage.

105.   A.B. has been held in GSP's small holding cages multiple times.  On one occasion in November 2020, A.B. was held in a holding cage at the back of a

GSP dormitory for three days.  He urinated into an empty plastic bottle given to him by an orderly.  The two men in neighboring cages likewise urinated in plastic bottles.  Each day, the orderly emptied the urine out of the bottles and returned the bottles to the men.  One man defecated into a plastic sandwich bag and threw the bag of feces outside of the cage.

106.   From around January 14 to January 17, 2021, M.N. was held in a small holding cage in dorm G-1.  He was apprehensive of being placed in the cage, but an officer slammed him into the bars and forced him inside.  M.N. was then left in the cage for three days, during which he was repeatedly deprived of meals.

107.   T.M., K.A., V.E., and C.Q. have all been held in the small holding cages for between one and three days under conditions similar to those described above.  T.M. was deprived of water and forced to sleep where he had defecated.  K.A. was not given access to the bathroom.  V.E. slept sitting up in the same place where he had just relieved himself.  C.Q. created a makeshift hammock from his sheet so as not to sleep on the floor, which was crawling with rats.

108.   Many men GSP's solitary confinement units remain subject to the conditions described in this complaint—including prolonged isolation, deplorable cell and shower conditions, and periodic abandonment in small holdings cages—for months or years.

II. **Indefinite solitary confinement in deplorable conditions deprives people in GSP's segregation units of basic human needs and subjects them to a risk of serious harm.**

    A. **There is a consensus among state, federal, and international authorities that solitary confinement causes harm.**

109.   Confinement in a cell for an average of 22 hours or more per day, alone or with other people, in a way that limits meaningful human contact, is deemed "solitary confinement" by correctional and medical experts in the United States and internationally.  This definition expressly includes people who are single- or double-celled.

110.   The use of solitary confinement at GSP causes a substantial risk of serious harm and deprives people of basic human needs.

111.   Solitary confinement has historically been a torture technique whose detrimental effects on physical and mental health are obvious to a reasonable person.

112.   Indefinite solitary confinement violates contemporary standards of decency and defies a consensus among correctional experts, who condemn the practice.  The Association of State Correctional Administrators, of which Defendant Ward is a member, has acknowledged that "[p]rolonged isolation of individuals in jails and prisons is a grave problem in the United States."  Press Release, Ass'n of State Corr. Adm'rs, *New Report on Prisoners in Administrative Segregation Prepared by the Association of State Correctional Administrators and*

*the Arthur Liman Public Interest Program at Yale Law School* (Sept. 2, 2015).  As

a result, "[c]orrectional leaders across the country are committed to reducing the

number of people in restrictive housing and altering what it means to be there."  *Id.*

113.   Plaintiffs expect to show that many states have restricted their use of

solitary confinement in the past decade.  Colorado now prohibits the use of solitary

confinement except in cases of serious disciplinary violations, and no person may

be held in solitary confinement for more than 15 days at a time.  Washington and

Pennsylvania have begun to replace solitary confinement with other programs.

Other states that have restricted their use of solitary confinement include Alaska,

Arizona, Arkansas, California, Connecticut, Indiana, Maine, Maryland,

Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, New

Jersey, New Mexico, New York, Ohio, Oklahoma, Texas, Virginia, West Virginia,

and Wisconsin.  The United States government has taken similar action to curb the

solitary confinement of people in federal prison.

114.   In 2019, in recognition of the harmful effects of solitary confinement,

Georgia passed a law prohibiting placement of pregnant or immediately

postpartum women in solitary confinement, administrative segregation, or medical

observation in a solitary confinement setting.

115.   The United Nations Special Rapporteur on Torture and Other Cruel,

Inhuman or Degrading Treatment or Punishment has concluded that solitary

31

confinement can constitute torture in violation of the International Covenant on Civil and Political Rights and the Convention Against Torture.  The Special Rapporteur recommended absolute prohibitions on both indefinite solitary confinement and the use of solitary confinement for more than 15 days at a time.

116.   Under Rules 43.1 and 44 of the United Nations Standard Minimum Rules for the Treatment of Prisoners, incarcerated people cannot be held for more than 22 hours per day without meaningful human contact indefinitely or for more than 15 days at a time.

117.   According to the American Bar Association (ABA), "[c]onditions of extreme isolation generally include a combination of sensory deprivation, lack of contact with other persons, enforced idleness, minimal out-of-cell time, and lack of outdoor recreation." *Standards for Criminal Justice: Treatment of Prisoners* § 23-3.8(b) (3d ed. 2011).  The ABA recommends that "[c]onditions of extreme isolation should not be allowed regardless of the reasons for a prisoner's separation from the general population." *Id.*

118.   Plaintiffs expect to show that, despite the broad consensus about the harmful effects of solitary confinement, Defendants continue to confine people in GSP's segregation units in conditions of extreme isolation, leading to widespread suffering and numerous deaths.

119.   Plaintiffs expect to show that social isolation brought on by conditions in GSP's segregation units causes or exacerbates hypertension, stroke, diabetes, and cardiac diseases.  It also reduces life expectancy.

120.   Plaintiffs expect to show that symptoms associated with solitary confinement for 10 days or longer include insomnia, dizziness, heart palpitations, deteriorated vision, weight loss, severe digestive problems, back and joint pain, and aggravation of preexisting medical problems.  These symptoms are common among people held in solitary confinement, even among previously healthy persons.

121.   Plaintiffs expect to show that solitary confinement causes severe discomfort that is processed by the nervous system as pain.  All other deprivations that are processed as pain—such as food and sleep deprivation—are associated with basic human needs that are necessary for survival.  The fact that isolation registers in the nervous system as pain shows that social interaction is a basic human need that is denied to people housed in GSP's segregation units.

122.   Plaintiffs expect to show that the lack of natural sunlight in GSP's segregation units causes people to lose the normal diurnal rhythm that orients a person's biological processes.  As a result, people incarcerated in GSP's segregation units experience significant sleep deprivation, resulting in physiological and psychological deterioration.

123.   Plaintiffs expect to show that numerous psychological consequences result from solitary confinement.  People exhibit a measurable loss in brain activity within a few days of being placed in solitary confinement.  The brain waves affected are those associated with cognition and emotional control.  Studies have found that the impaired brain functioning caused by prolonged isolation continues long after a person returns to a normal prison setting.

124.   Plaintiffs expect to show that many of the conditions associated with life in GSP's segregation units—including lack of physical activity, lack of meaningful human interaction, and lack of visual stimulation—are sufficient to dramatically change a person's brain functioning when confinement continues for longer than a few days.

125.   Plaintiffs expect to show that solitary confinement of 10 days or longer results in anxiety, nervousness, hypersensitivity to stimuli, difficulties with sleep and concentration, memory loss, decreased impulse control, and feelings of being on the verge of "losing it" or breaking down.  Solitary confinement also causes irritability, chronic depression and hopelessness, hallucinations, suicidal ideation and behavior, and other psychological consequences.

126.   Plaintiffs expect to show that Defendants do not eliminate these harms by confining two people to the same cell.  People forced to live together in harsh and isolating conditions for 22 hours or more per day do not have normal social

34

interactions.  In fact, most people in double cells in GSP's isolation units experience persistent psychological stress from sharing a small space with another person.

127.   Plaintiffs expect to show that all these psychological consequences manifest themselves in concrete ways that harm incarcerated persons as well as society.  For example, people who have been held in solitary confinement have a markedly higher rate of recidivism upon their release from prison.  In addition, people held in solitary confinement have a substantially higher rate of suicide.

### B. Solitary confinement and harsh conditions in GSP's segregation units have led to numerous deaths by suicide.

128.   Plaintiffs expect to show that, at GSP, and in the solitary confinement units in particular, suicides have escalated dramatically in the last year and a half.

129.   Between September 2019 and May 2021, the following 12 people committed suicide at GSP: Jonathan Anthony Strickland, Brandon Tyler Kent, Rickey Upshaw, Dillian Cortez Southall, James Patrick Hartzog, Stephen Ray White, Terry James Johnson, Ruben Darius Jackson, Ramon Carlton Gardner, Terrell Toshra Hamilton, Collin Jackson Donaldson, and Malik Pitts.  At least three of these men—Mr. Johnson, Mr. Jackson, and Mr. Gardner—lived in the Tier

II Program dorms.[8]  Several other men were housed for some period of time in solitary confinement prior to taking their own lives.[9]

130.   In the last year and a half, more suicides have occurred at GSP than in any other prison in the state.  Almost all of these suicides occurred in rapid succession over the course of short periods: three suicides occurred between early February and early March 2020, five occurred between mid-July and October 2020, and two occurred between April and May 2021.

131.   The suicides of Terry Johnson and Ruben Jackson occurred only one day apart, on August 10 and August 11, 2020.  Both men committed suicide while living in solitary confinement in G Building.

132.   A few weeks later, Ramon Gardner, who had attempted to take his own life several times before, committed suicide in a Tier II Program housing unit.

133.   On April 10, 2021, Collin Donaldson, who lived in K-3, a Tier II Program Step-Down dormitory, was found hanging from the light fixture of his cell.[10]  At 7:20 a.m., an on-duty officer wrote in the prison logbook that she was

---

[8] Another three men—Mr. Strickland, Mr. Upshaw, and Mr. Southall—killed themselves in DE-4, a unit that, until recently, housed people with serious mental health conditions in solitary confinement.

[9] Other documented suicides may have occurred in GSP's segregation dormitories.  However, the incident reports for many suicides at GSP do not state where they occurred.

[10] "Step-Down" is a program for people transitioning off the Tier II Program and into general population.

36

solely responsible for supervising all the men in K Building.  She wrote that she would "not be going into the dorms because [she] [did] not have a central station officer to keep a visual."  Two hours later, Mr. Donaldson was found dead in his cell.

134.   Many men in GSP's solitary confinement units have witnessed people in their dorms commit suicide.

135.   For example, in or around June 2017, a man in M.H.'s dormitory told M.H. that he wanted to kill himself.  M.H. tried talking to the man to convince him not to commit suicide, but the man eventually stopped responding.  When M.H. and other men in the dorm realized that the man was hanging in his cell, they beat on their cell doors and screamed for help.  By the time an officer arrived, the man was dead.

136.   A man who worked as an orderly in DE-4, a segregation dormitory that, until recently, housed people with serious mental illness, was present in or around February 2020, shortly before another man in the dorm took his own life. The orderly heard the man call for help and saw him standing on the sink with a sheet around his neck.  The orderly immediately ran to the unit manager for assistance.  The unit manager responded, "let him do it."  The man hung himself.

137.   In or around August or September 2020, V.E. heard the man in the cell across from him screaming for help and begging to be taken out of his cell.

37

The man's screaming persisted on and off for two days.  Although officers were present in the dorm on the second day, they did not attend to the screaming man. On the third day, V.E. watched through his cell door flap as officers entered the man's cell and removed his dead body from where he was hanging.

138.   Defendants have long been on notice that people at GSP experience psychiatric decompensation as a result of the prison's harsh conditions and isolation.  Defendants have also long been on notice that people at GSP frequently engage in self-harm and suicidal behaviors due to the prison's harsh conditions and isolation.

139.   Defendants have long been on notice that many people have committed suicide at GSP.  For example, according to the Department's own records, between December 2014 and September 2018, the following people committed suicide at the prison:

     a.  Hugo Tepanca on September 11, 2018;

     b.  Niqua Thomas on July 26, 2018;

     c.  Michael Jordan on June 27, 2018;

     d.  Roosevelt Agurs on September 24, 2017;

     e.  Walter Eller on September 4, 2017;

     f.  Stanley Dunn on June 21, 2017;

     g.  Andrew Baird on November 29, 2016;

h.  Rex Weaver on September 11, 2016;

i.  Rashan Price on May 21, 2016;

j.  Edwin Alvarez on November 28, 2015;

k.  Christopher Caruso on June 18, 2015;

l.  Lyle Meadors on April 6, 2015;

m. Jonathan Tanner on February 27, 2015; and

n.  Steven Walthall on December 17, 2014.[11]

140.  Plaintiffs expect to show that many of the suicides described here

occurred after men were subjected to solitary confinement at the prison.

### III. People with serious mental illness in GSP's segregation units experience particularly acute harm from their indefinite solitary confinement without minimally adequate mental health care.

#### A.  People with serious mental illness in GSP's segregation units experience a worsening of their conditions.

141.  All persons held in solitary confinement in GSP's segregation units

experience profound psychological stress.  However, the negative consequences of

solitary confinement are magnified for people with psychiatric disabilities.

---

[11] Additionally, in November 2014, Nicholas Baldwin attempted to hang himself in his cell at GSP. He spent three years in a near-comatose state before dying.  Prior to Mr. Baldwin's attempted suicide, his mother had called the prison numerous times to tell prison officials that she feared for her son's safety.  *See* Rhonda Cook, *Mother Says She Warned of Son's Suicide, Georgia Prison Failed to Act*, The Atlanta Journal-Constitution, May 3, 2017, https://www.ajc.com/news/local/mother-warned-suicide-possible-but-prison-system-didn-act/qSwHOswgrD4JBPclBMVtCL/.

142.   In 2019, 204 of the 281 men on Tier II status at GSP (or 73 percent), were designated as "Mental Health Level II" patients, meaning that their mental health functioning was either impaired due to a mental illness, or in need of monitoring due to a recent history of suicidal ideation, self-injurious behavior, or crisis unit placement.

143.   For these individuals, prolonged isolation compounds both their outward manifestation of symptoms and their internal experience of their disorders. For instance, the mood swings that some persons experience in isolation may amplify the pre-existing emotional instability experienced by people with bipolar disorder.  People prone to psychotic breakdowns may suffer more serious and more frequent psychotic episodes in isolation, where they are denied the stabilizing influence of social feedback that grounds other people's perceptions of reality.

144.   Many of the men subjected to the longest and harshest conditions of isolation at GSP have serious mental illness.  Solitary confinement significantly worsens their mental health conditions and exacerbates their symptoms.

145.   K.J., who has been diagnosed with bipolar disorder and severe recurrent major depressive disorder with psychotic features, was not permitted almost any out-of-cell time during his approximate year and eight months in the Tier II housing units at GSP.  This long-term isolation caused K.J. to experience

fear, distress, hopelessness, and frequent thoughts of suicide. He once tried to hang himself by placing a rope around his neck.

146. K.M., who has been diagnosed with major depressive disorder and a schizophrenia-spectrum disorder, was rarely allowed out of his cell for the nearly 20 months he was confined in a Tier II isolation cell, except for showers, legal visits, and occasional trips to the yard. As a result of his solitary confinement in the Tier II Program, K.M. heard voices, had thoughts of suicide, cut himself repeatedly, and attempted suicide. He described the Tier II Program at GSP as "close[] to death itself."

147. T.M. was allowed out-of-cell time on the yard only two times between mid-May and mid-June 2020. His access to out-of-cell time ended soon after that. For the following few months, T.M. was not allowed out-of-cell time on the yard. His mental health deteriorated from constant isolation, and he regularly felt unstable and suicidal. In the summer of 2020, he attempted suicide by overdose.

148. As a result of near constant lockdown, many men in GSP's segregation units have no outlet for their anxiety, agitation, or ruminating thoughts. Some persons with mental illness yell for hours on end. Others pound or kick their doors, subjecting others to a constant din of banging and screaming. Still others disfigure themselves, set fire to their cells, flood their cells with water, or throw blood and feces at the walls.

41

**B.      People with serious mental illness in GSP's segregation units are deprived of mental health care.**

149.   Men with serious mental illness are required by prison policy to receive adequate mental health services, including visits with a mental health counselor and, where appropriate, psychopharmacological treatment.  In reality, however, most men GSP's segregation units have little to no access to psychiatric care.

150.   Many men in solitary confinement at GSP have never seen or spoken to a psychiatrist, outside of an initial evaluation or placement in the ACU.  In fact, most men do not receive psychiatric consultations unless they attempt suicide.

151.   Men who have been on mental health medications for years at other prisons, and who require medication, are often told that they are on a "list" to see a mental health professional.  Many men languish on the list for months while their mental health symptoms worsen.  Others simply do not see a mental health professional at all.

152.   Within Georgia prisons, counselors are the primary point of contact between mental health staff and people with mental illness.  But recent audits of GSP's mental health care system show that there have been periods in the last two years when half of the prison's authorized mental health counselor positions have been vacant.  The mental health counselors who *are* present have limited interactions with men in solitary confinement.  When counselors enter the dorms,

they simply stop by the cell doors, slip puzzles through the flaps, and move on. Their brief interactions with the men are not confidential.

153.   Without adequate psychiatric care, men in GSP's segregation units repeatedly cut themselves, plan for suicide, and attempt to take their own lives.

154.   N.S. has been diagnosed with a psychotic disorder and experiences depression, post-traumatic stress disorder, and auditory and visual hallucinations. While in GSP's Tier II Program, he was repeatedly denied out-of-cell recreation time, resulting in him being isolated in his cell around the clock for extended periods.  Following a suicide attempt in 2019, N.S. stopped receiving his mental health medication.  Although he repeatedly requested visits with a member of the mental health staff to discuss his symptoms, he did not receive his medication for more than six months.  After that, he was sporadically placed on and off mental health medication.  When his medication was discontinued, he hallucinated and experienced anxiety and paranoia.

155.   M.N. was transferred to GSP's Tier II Program in May 2019.  His medical records show that he was transferred specifically to accommodate his mental health needs, including "psychological trauma" due to military combat, suicidal ideation, auditory and visual hallucinations, and a history of self-harm, including an "attempt[] to shoot [him]self."  Despite this history, M.N. was subjected to extended periods of constant in-cell isolation and was rarely seen by a

43

mental health provider.  His records show that, between May 17, 2019, and October 23, 2019, he was not seen by a mental health professional or provided with any mental health treatment.  Aside from cursory interactions with mental health counselors at his cell door, M.N. had only two brief visits with mental health professionals at GSP.  Neither mental health professional provided any treatment, prescribed any medication, or conducted any follow-up.

156.   V.E. has been on mental health medication since he was a child, after being diagnosed with bipolar disorder.  He has a history of self-harm, including attempted hangings.  V.E. was told that he was transferred to GSP for mental health care.  However, in the year that he was confined to the Tier II Program, he was not seen by a psychiatrist or prescribed any medication.  Without his medication, V.E. experienced anxiety attacks that were accompanied by physical symptoms.  During these episodes, his muscles twitched, his mind ran, he heard frightening echoing sounds, and he could not breathe.

157.   K.A. has been diagnosed with bipolar disorder and experiences persistent feelings of agitation and depression.  He has attempted suicide by hanging or overdose at least five times while on GSP's Tier II Program.  Once, he attempted to hang himself with a rope, but his cellmate cut him down.  He also cuts himself frequently and has numerous scars on his arms from cutting.  When K.A.

has reported thoughts of suicide to prison staff, they have often failed to act.  On one occasion, an officer told him to simply "do it."

158.   J.H. cut himself over 30 times while housed in GSP's Tier II Program. On several occasions, he cut himself in front of officers who walked away while he bled onto the cell floor.

> ### C.      People with serious mental illness in GSP's segregation units are often confined to the prison's Acute Care Unit in repulsive conditions.

159.   The only form of mental health "treatment" that is consistently available to men with psychiatric disabilities at GSP is placement in DW-2, the prison's mental health crisis unit.

160.   The conditions that men endure in the DW-2 cells are so harsh and revolting that they exacerbate rather than alleviate their mental health symptoms.

161.   DW-2 is known as the Acute Care Unit, or ACU.  The unit contains 13 single-person cells and a shower.[12]  None of the cells in the ACU is equipped with mattresses, sheets, or blankets.  In each cell, the place designated for sleep is a metal bunk bolted to the floor.

---

[12] The Crisis Stabilization Unit, or CSU, is another mental health crisis unit at GSP.  The CSU contains six single-person cells and is located in the infirmary.

162.   The ankle-height, steel bunks in the ACU are often covered in the crusted feces and blood of previous inhabitants.  Many of the walls and toilets are smeared in bodily fluids and human waste.

163.   When people are placed in the ACU cells, they are not provided with cleaning supplies.  They are denied basic hygiene products, like toothpaste or soap.

164.   While housed in the ACU, people in psychiatric distress do not have clothing.  The only items they are given to wear are a medical gown, which is made of thin, tissue-like material, or a suicide-prevention smock, which is a collarless, sleeveless gown.[13]

165.   Staff members in the ACU keep the unit windows open.  During the winter, the cells are very cold.  During the summer, they are extremely hot.

166.   There is one roll of toilet paper that is shared among the men housed in the ACU.  The roll is located in the middle of the dormitory, outside of the cells, so the men must ask correctional staff to use it.

167.   When there is no toilet paper left, or no officer present to retrieve it, some men resort to tearing off pieces of their medical gowns to use as toilet paper. After a few days in an ACU cell, most men's gowns have disintegrated to the point that they can no longer be worn, so the men are naked.

---

[13] In recent weeks, the prison has declined to provide suicide-prevention smocks to men who request them, citing an insufficient supply.

168.   Because the toilets in the ACU clog easily, and there are few, if any, means for men to dispose of their waste, some men in the ACU resort to defecating in wads of tissue paper and leaving them on the ground.  As a result, many cells in the ACU have heaps of trash and feces strewn on the floor.  Some of the cells also have leaks.  When it rains, water pools on the ground.

169.   In October and November 2019, K.M. spent approximately five weeks in an ACU cell after experiencing auditory hallucinations and expressing plans for self-injury.  He slept on the floor because the metal bed frame in his cell was smattered in blood and he did not have supplies to clean it.  For about five weeks, K.M. was not allowed out of the cell to shower, and he was not given soap or toothpaste.

170.   In March and April 2020, K.M. was again placed in an ACU cell for approximately three weeks.  He slept on his suicide-prevention smock—the only article of clothing he was given—because the bed frame was filthy and the rest of the cell was spattered in feces and blood.  Throughout the night, K.M. heard rats squealing and crawling about the cell.  For three weeks, he was permitted only one shower.

171.   For nine days in June 2020, K.M. was again placed in an ACU cell in deplorable conditions.  The only clothing item the prison provided was a paper

gown.  After just a few days, the gown was in tatters, and K.M. was left naked in his cell.

172.   For more than a week, K.M. slept huddled on the floor because there were feces, blood, and urine on the metal bed frame.  He collected the paper wrapped around his sandwiches to use as a makeshift bed on the otherwise bare floor.  He did not receive any hygiene items, and he was not permitted pens, paper, or mail.  During this time, he was fed two cold sandwiches for breakfast, lunch, and dinner, on several occasions with spoiled bologna.

173.   Many other men have been held in similar physical conditions in the ACU cells.

174.   K.J. was held in an ACU cell in or around the spring of 2020.  The walls were coated in pepper spray residue and excrement, and the cell floor was flooded with water and urine.  K.J. slept on the floor instead of the steel bunk, which contained feces from the cell's previous occupant.  Roaches crawled throughout the cell at night.

175.   For seven weeks in October and November 2020, J.H. was housed in an ACU cell without a shower, despite repeated requests to bathe.  After seven weeks, he was finally allowed a shower.  During his time in the ACU, J.H. was not given any clothing apart from a paper gown and two pairs of shorts, one of which he used as a rag to clean the feces, urine, and dried blood in the cell.

176.   Although people are sent to the ACU for psychiatric care after expressing suicidal ideation, attempting suicide, or engaging in self-injurious behavior, people in the unit are left largely unsupervised by staff.  Some men in the ACU have cut themselves and lost consciousness before being discovered.

177.   The unit is not just poorly supervised by correctional officers; it is also sometimes unattended by mental health professionals.  Some men report difficulty accessing mental health nurses in the ACU because rounds can be infrequent.  Those who see a psychiatrist or other mental health professional receive only brief consultations and little to no follow-up.

178.   Because conditions in GSP's segregation units cause people to become depressed and suicidal, the 13 cells in the ACU are often occupied.  When no cells are available in the ACU, suicidal men are sometimes left in their assigned cells.

**IV.   Defendants have long been on notice that conditions in GSP's segregation units cause serious psychological harm.**

**A.   Conditions in GSP's segregation units are obviously harmful.**

179.   The conditions described above, and every detail of life in GSP's solitary confinement units, are planned and controlled by policies designed and approved by Defendants Ward, Holt, Toole, Shepard, Sauls, and Ioannou.  Every

detail of those policies is implemented by or under the direct supervision of Defendants Bobbitt, Spinn, Wicker, Edwards, Irwin, and Sharpe.

180.   Because the conditions in GSP's segregation units are so rigidly controlled at all management levels, each Defendant is actually and subjectively aware of, and responsible for, the conditions of confinement described here.  Each Defendant is also actually and subjectively aware of, and responsible for, the harm caused by those conditions.

181.   The deplorable conditions in GSP's segregation units, and the resultant harm to incarcerated people, are obvious.  The GSP Defendants make rounds at the prison and are thus knowledgeable about the poor physical conditions of the cells; the practice of keeping people in prolonged solitary confinement; and the psychiatric deterioration of people held in isolation environments, leading to frequent crisis unit placement.  The Central Office Defendants are also aware of these conditions, both from their periodic physical presence at the prison and from the repeated warnings they have received—from internal and external auditors— about the dangers of such conditions.  All Defendants are also aware of GSP's officer vacancy rate, which hovers just over 70 percent.  The consequences of understaffing for people in segregation are obvious to prison officials.

182.   Despite Defendants' knowledge of the harmful conditions described in this complaint, Defendants have individually and collectively failed to cure them.

> **B.   Department auditors have repeatedly warned defendants about dangerous conditions and inadequate mental health care in GSP's segregation units.**

183.   Both internal and external auditors have warned Defendants that GSP does not provide people in solitary confinement with adequate access to time out of their cells.  Auditors have further warned that keeping people in such conditions can cause serious harm, and possibly death.

184.   Dr. Jeffrey Metzner is a psychiatrist with over 40 years of experience in forensic psychiatry.  Pursuant to a contract with the Department, Dr. Metzner conducts an annual audit of the provision of mental health services in certain Georgia prisons.

185.   In April 2019, in a report addressed to Defendant Ward, Dr. Metzner notified the Department that "SOPs are not being followed for inmates in the Tier programs, especially with regards to out of cell recreational time."  Letter from Jeffrey L. Metzner, M.D., to Timothy C. Ward, Comm'r, Ga. Dep't of Corr. (Apr. 15, 2019) (hereinafter *Metzner Audit*).  Dr. Metzner further noted that "[o]ut of cell programming for mental health caseload inmates in the tier programs is not adequate." *Id.*

186.   In November 2019, internal auditors at the Department's Office of Professional Standards reached the same conclusion.  These auditors conducted an assessment of GSP's operations, including security procedures, care and custody of incarcerated people, and health services.  They found that people held in solitary confinement "[were] not being offered recreation in accordance to GDC policy and procedure guidelines."  Audit, Ga. Dep't of Corr. Office of Prof'l Standards, *Final Report: Georgia State Prison, Prepared for Trevonza Bobbitt, Warden* (Nov. 14, 2019).

187.   Auditors also warned of the specific deficiencies in GSP's system for the provision of mental healthcare.  In his 2019 report to Defendant Ward, Dr. Metzner warned that the "institutional culture" at GSP was "very problematic from the perspective of facilitating the provision of adequate mental health services." *Metzner Audit*.  He reported that "significant and chronic staffing vacancies" among mental health professionals "preven[t] implementation of an adequate mental health services system." *Id.*

188.   Dr. Metzner also found that GSP staff did not conduct initial or transfer psychological evaluations of men with serious mental illness; that there was a "significant backlog" of psychiatric evaluations; and that senior mental health staff did not adequately supervise provisionally-licensed and unlicensed mental health counselors.  *Id.*

189.   The Department's internal audits are consistent with Dr. Metzner's audit.  One 2018 audit of GSP's operations by the Department's Office of Professional Standards, directed to former GSP Warden Marty Allen, noted multiple "areas of concern" in the prison's provision of mental health care to people with serious mental illness and people in solitary confinement.  Audit, Ga. Dep't of Corr. Office of Prof'l Standards, *Georgia State Prison: 2018 Annual Assessment, Final Report* (June 28, 2018).  For instance, the audit warned that Defendants provided "no out of cell individual contact by Mental Health Counselors for Tier II offenders."  *Id.*

190.   Another internal audit from 2018 conducted by the Office of Health Services found that GSP was only 65 percent compliant with standards for developing mental health treatment plans and 35 percent compliant with standards for providing mental health care to those in lockdown.  Audit, Ga. Dep't of Corr. Office of Health Servs., *Georgia State Prison (GSP) 2018-2019 Yearly Audit Report & Attachments* (July 10, 2018).

191.   In this 2018 report, auditors specifically warned Defendants of their failure to provide evaluation and treatment for people in "isolation [and] segregation."  *Id.*  They wrote that a "remedial strategy must be developed" because "deficits in Lockdown Services could lead to decompensation and possible completed suicides or other self-harm."  *Id.*  They added that "[e]valuation for

53

services in Isolation/Segregation is important because of the impact (emotional and cognitive) of lockdown" and that "[t]he Mental Health Department at Georgia State Prison should need no reminder of such impacts and the possibilities of completed suicides within lockdown as a consequence of emotional and cognitive decompensation." *Id.*

192.   In this report, the Department's auditors repeatedly warned of such serious deficiencies that the Department was in "possible legal jeopardy." *Id.*

193.   In 2019, the Department's auditors provided additional, urgent warnings.  They noted that counselors in the Tier Program regularly "copied and pasted" notes about mental status check-ups and that security officers failed to conduct 30-minute rounds in administrative segregation dorms.  Audit, Ga. Dep't of Corr. Office of Prof'l Standards, *Georgia State Prison: FY2019 Annual Assessment*, *Final Report* (Sept. 25, 2018).

194.   They also noted, consistent with Dr. Metzner's findings, that the mental health team lacked a clinical director and multiple mental health counselors.  In a report directed to Defendant Bobbitt and Mental Health Unit Manger Juanita Reno, auditors wrote that these vacancies "limit[ed] . . . the provision of effective mental health services."  Audit, Ga. Dep't of Corr. Office of Health Servs., *Georgia State Prison (GSP) 2019-2020 Audit Report* (Dec. 23, 2019).  They also concluded that existing mental health staff members at the prison

were "not skilled in the identification of mentally ill offenders within the facility," and that their "treatment efforts were not compliant with GDC's SOPs." *Id.*

195.   Finally, auditors found that in the full year since the alarming 2018 audit, GSP's level of compliance with basic treatment norms for people with mental illness had dropped precipitously.  For instance, compliance with standards for providing mental health treatment to those in lockdown dropped from 35 percent to two percent, and compliance in several other areas—including the maintenance of a suicide precautions log—fell to zero percent.  *Id.*

196.   Just as the Defendants' own auditors warned, suicide rates at the prison increased after the Department's 2018 and 2019 audits.

197.   All these audits were specifically directed to Defendants in this action, including Defendants Ward and Bobbitt, and copied to other senior correctional staff.  At least one audit directed Defendants to submit a written remediation plan, called a "Corrective Action Plan," to the Department's Central Office, of which Defendants Ward, Holt, Toole, Shepard, Sauls, and Ioannou are all members. Therefore, Defendants were actually and subjectively aware of the substantial risk of serious harm identified by their auditors.  Still, they failed to take reasonable steps to respond to the harm.

C.   **Defendants have been subject to federal litigation regarding conditions similar to those that persist in GSP's segregation units.**

198.   Defendants are actually aware of the consequences of keeping Plaintiffs in solitary confinement and poor conditions, because senior prison administrators in the Department have been, and still are, subject to federal litigation regarding similar conditions at GSP and at other prisons.

199.   For instance, in *Quintanilla v. Bryson*, 730 Fed. App'x. 738, 747 (11th Cir. 2018), the Eleventh Circuit held that a person confined to the Tier II Program at Smith State Prison had sufficiently alleged a deprivation of his basic human needs because he "spent nearly all of his time in an isolation cell with 'an excessive vermin and insect infestation,' including rats;" "the prison [did] not adequately clean his cell and he [was] denied the adequate opportunity to clean it himself;" the showers were "decrepit" and "flooded;" and he was denied "adequate food, exercise and human contact." The Court held that Quintanilla's "near-constant exposure to unhygienic conditions," combined with his lack of access to out-of-cell recreation, stated an Eighth Amendment violation. *Id.*

200.   In *Canupp v. Paul*, 716 Fed. App'x. 836 (11th Cir. 2017), the Eleventh Circuit reached a similar conclusion. The Court held that a man confined to an isolation cell at GSP for two weeks—without adequate drinking water and with "prolonged exposure" to his own excrement—stated an Eighth Amendment

violation. *Id.* at 840-41.  Although prison officials knew of the problem and took "some action" in response, the Court held that their failure to fully remedy the issue—while the man's lack of access to safe drinking water persisted—could constitute deliberate indifference to his basic human needs and violate the Eighth Amendment. *Id.* at 841-43.

201.   Because of these and other cases, Defendants have long been on notice of the harms of keeping people in solitary confinement in deplorable physical conditions.  *See also Hardwick v. Ault*, 447 F. Supp. 116, 125 (M.D. Ga. 1978) ("Long periods of lock up in a confined space, limited contact with others, continued and unexpected surveillance and limited exercise eventually take a serious toll on the mental health of [incarcerated persons.]").

202.   In many respects, the conditions in GSP's segregation units are worse than those at issue in the cases discussed above.  Plaintiffs and others at GSP are:

    a.   deprived of almost any outdoor yard time;

    b.   isolated in cells infested with rats, roaches, and mice and smelling of human waste;

    c.   abandoned for hours at a time in locked, hot shower stalls;

    d.   frequently held for prolonged periods of time in small holding cages without access to food, water, or a toilet;

    e.   subject to unsanitary and repulsive conditions of confinement in the mental health crisis unit, where cells are often smeared in other people's blood and feces; and

    f.   deprived of almost any access to appropriate psychiatric care, leading to high rates of suicide.

203.   Since the litigation described above, Defendants have known that conditions in GSP's segregation units pose a substantial risk of serious harm.  Yet Defendants have not taken reasonable steps to improve these conditions.

    **D.    Plaintiffs' counsel placed Defendants on notice of unconstitutional conditions in GSP's segregation units, but Defendants failed to take reasonable steps to ameliorate them.**

204.   Between May and October 2020, undersigned counsel sent Defendants three letters putting them on notice of the deleterious effects of solitary confinement, terrible conditions, and understaffing at GSP.

205.   In the first letter, sent on May 21, 2020, counsel warned that conditions in the Tier II Program housing units had fallen below constitutional standards and asked officials to remedy the problems.  Counsel for Defendants responded with a two-sentence email stating that Defendants would "research the allegations and remediate any problems that we find."

58

206.   Between May 21 and September 14, conditions in GSP's segregation units continued to deteriorate.  At least four additional people committed suicide at the prison.  Three of the decedents lived in solitary confinement.

207.   On September 18, 2020, counsel sent a second letter to Defendants, noting specifically the increase in suicides and the persistence of unconstitutional conditions.  Counsel also provided a list of five men in the Tier II Program housing units who were believed to be at high risk of imminent suicide or who otherwise faced an immediate and serious risk of bodily harm.  Defendants did not respond.

208.   On October 28, 2020, counsel sent a third letter to Defendants.  This letter alerted Defendants to a man in their custody who had been repeatedly tortured by other incarcerated people and requested that Defendants take certain measures to protect him.  The letter also requested that Defendants provide a response about the people identified in counsel's September 18 letter.

209.   Defendants' counsel responded that the Department would "not discuss" the housing assignments of the people identified in Plaintiffs' counsel's letter.  Instead, she referred Plaintiffs' counsel to the Department's website, www.gdc.ga.gov, to "view the facility to which each is assigned."

210.   Since October 2020, counsel has sent additional letters to the Department regarding unconstitutional conditions, as well as the Department's

failure to provide people in solitary confinement with reasonable access to the grievance process.

211.   Despite the overwhelming amount of notice to Defendants, the conditions in GSP's solitary confinement units have not changed.  Incarcerated people remain locked in their cells nearly 24 hours per day, seven days per week, with no access to programming.  Cells are still filthy, vermin-infested, and flooded. Men continue to be held in locked shower stalls and small holding cages for hours or days with no food, water, or toilet access.  Seriously mentally ill people continue to be denied reasonable access to mental health care.

212.   Defendants' failure to reasonably respond to repeated warnings of the substantial risk of serious harm caused by prolonged or indefinite solitary confinement—first by Defendants' own auditors, then by the Court, and finally by undersigned counsel—constitutes deliberate indifference to the lives of incarcerated persons, in violation of the Eighth Amendment.

## CLASS ACTION ALLEGATIONS

213.   Plaintiffs bring this action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated persons.  Plaintiffs make the following class action allegations:

### A.   Principal Class

214.   Plaintiffs seek to certify a principal class defined as follows:  All persons who are now or will in the future be held in GSP's Tier II Program segregation units or other segregation units that indefinitely confine persons to their cells for 22 or more hours per day.

215.   Plaintiffs meet the requirements of Rule 23(a) for the following reasons:

    a.  The class is so numerous that joinder of all members is impracticable. The class consists of approximately 300 people who are currently assigned to the Tier II Program at GSP; an unknown number of people who will be assigned to the Tier II Program at GSP in the future; and an unknown number of people who are now, or will in the future, be confined to GSP's other segregation units.  The class is ascertainable because the placement of a person in GSP's Tier II Program or similar segregation units is immediately apparent from Defendants' records and the fact of the person's confinement there.

    b.  There are questions of law and fact common to the class, including whether the totality of conditions in GSP's Tier II Program and similar segregation units constitutes cruel and unusual punishment; whether Defendants have knowledge of the conditions and

deprivations described in this complaint; and whether Defendants
have reasonably responded to the conditions and deprivations
described in this complaint.

c.  The policies challenged in this action apply with equal force to
Plaintiffs and all members of the class so that Plaintiffs' claims are
typical of those of the class.  Plaintiffs are subject to the same
unconstitutional conditions as other people who are now or will in the
future be held in segregation housing units at GSP.

d.  Plaintiffs and their counsel will adequately protect the interests of the
class.  Plaintiffs possess no interests adverse to those of other class
members.  Plaintiffs are represented by attorneys from the Southern
Center for Human Rights, a nonprofit organization with experience in
prison litigation, and Kilpatrick Townsend & Stockton LLP, a private
law firm with extensive experience in complex class action litigation.

216.  Plaintiffs meet the requirements of Rule 23(b)(2) in that Defendants
have acted or failed to act on grounds that apply generally to the class, so that final
injunctive or declaratory relief is appropriate respecting the class as a whole.  In
particular, Plaintiffs seek to represent the class in challenging, under the Eighth
Amendment, solitary confinement and conditions of confinement in the Tier II

Program and similar segregation units at GSP.  Those conditions apply to all people who are now or will in the future be held in segregation units at GSP.

### B.  Psychiatric Disability Subclass

217.   Plaintiffs seek to certify a subclass defined as follows:  All persons who are now or will in the future be held in GSP's Tier II Program segregation units or other segregation units that indefinitely confine persons to their cells for 22 or more hours per day, and who are or have ever been classified by the Department as being on Mental Health Level II or above.

218.   Plaintiffs meet the requirements of Rule 23(a) for the following reasons:

    a.   The class is so numerous that joinder of all members is impracticable. The class consists of more than 200 persons classified as Mental Health Level II or above who are now or will in the future be assigned to GSP's Tier II Program and similar segregation units.  The class is ascertainable because the members' assignment to Mental Health Level II or above is immediately apparent from Defendants' records.

    b.   There are questions of law and fact common to the class, including whether the totality of conditions in GSP's Tier II Program and similar segregation units, when imposed on people classified as Mental Health Level II or above, constitutes cruel and unusual

punishment; whether Defendants have knowledge of the conditions and deprivations described in this complaint; whether Defendants have reasonably responded to the conditions and deprivations described in this complaint; and whether Defendants have discriminated against the subclass members by reason of their psychiatric disabilities.

c. The policies challenged in this action apply with equal force to Plaintiffs and all members of the class so that Plaintiffs' claims are typical of those of the class.  Plaintiffs are subject to the same unconstitutional conditions as other persons classified as Mental Health Level II or above who are now or will in the future be held in GSP's Tier II Program or similar segregation units at GSP.

d. Plaintiffs and their counsel will adequately protect the interests of the class.  Plaintiffs possess no interests adverse to those of other class members.  Plaintiffs are represented by attorneys from the Southern Center for Human Rights, a nonprofit organization with experience in prison litigation, and Kilpatrick Townsend & Stockton LLP, a private law firm with extensive experience in complex class action litigation.

219.  Plaintiffs meet the requirements of Rule 23(b)(2) in that Defendants have acted or failed to act on grounds that apply generally to the class, so that final

injunctive or declaratory relief is appropriate respecting the class as a whole.  In particular, Plaintiffs seek to represent the class in challenging, under the Eighth Amendment, solitary confinement and conditions of confinement for people classified as Mental Health Level II or above who are held in GSP's Tier II Program and similar segregation units.  Those conditions apply to all people experiencing psychiatric disabilities who are now or will in the future be held in segregation units at GSP, and any prospective relief granted to Plaintiffs with respect to those matters will necessarily benefit each class member.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATIONS OF THE EIGHTH AMENDMENT'S
### CRUEL AND UNUSUAL PUNISHMENTS CLAUSE

(By Plaintiffs Middleton, Hodges, and Holbrooks against all Defendants)

220.   Plaintiffs incorporate paragraphs 1-16 and 19-219 as if fully set out herein.

221.   The totality of conditions in GSP's Tier II Program and similar segregation units constitutes cruel and unusual punishment.

222.   The Central Office Defendants have final authority over each person's duration of confinement in GSP's segregation housing units, and the authority to prescribe the conditions of confinement, including the duration and degree of isolation imposed.  The GSP Defendants have direct control over the conditions of

confinement in GSP's segregation housing units, including the duration and degree of isolation imposed.

223.   Prolonged or indefinite solitary confinement is considered torture by many authorities and violates contemporary standards of decency in the United States and many other countries.

224.   Prolonged or indefinite solitary confinement deprives people of basic human needs, including exercise, social interaction, and sensory stimulation. These deprivations are processed by the nervous system as pain.

225.   Prolonged or indefinite solitary confinement creates a substantial risk of serious harm.  The potential harms include mental illness, brain dysfunction, self-mutilation, suicide, hypertension, and heart problems.  The effects continue long after a person is released from confinement and may be irreversible.

226.   Moreover, forcing people to endure unsanitary conditions in their housing units violates contemporary standards of decency and creates a substantial risk of serious harm.

227.   By isolating Plaintiffs and other people in unsanitary conditions in GSP's segregation units and failing to take action to alleviate the conditions there, Defendants violate contemporary standards of decency and deprive people of basic human needs.  Defendants violate the Eighth Amendment prohibition against cruel

and unusual punishment, as incorporated by the Fourteenth Amendment Due

Process Clause.

228.   Plaintiffs seek declaratory and injunctive relief on behalf of

themselves and a class of similarly situated persons to prevent further violations of

their rights by Defendants.

### COUNT II:
### VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT OF 1990 AND THE REHABILITATION ACT OF 1973

(Disability Discrimination in Programs and Activities)

(By Plaintiff Middleton against all Defendants)

229.   Plaintiffs incorporate paragraphs 1-16 and 19-219 as if fully set out

herein.

230.   Congress enacted the Americans with Disabilities Act (ADA), 42

U.S.C. §§ 12101 et seq., to provide a clear and comprehensive mandate for the

elimination of discrimination against people experiencing disabilities and to

provide strong and consistent standards for identifying and addressing such

discrimination.  42 U.S.C. § 12101(b)(1) – (2).

231.   The ADA is based on Congress's finding that, among other things,

"[h]istorically, society has tended to isolate and segregate individuals with

disabilities, and, despite some improvements, such forms of discrimination against

individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

232.    Congress also found that "[i]ndividuals with disabilities continually encounter various forms of discrimination, including . . . relegation to lesser services, programs, activities, benefits, jobs or other opportunities."  42 U.S.C. § 12101(a)(5).

233.    Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130.

234.    The ADA defines a "disability" as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).

235.    Plaintiff Middleton and each of the members of the Psychiatric Disability Subclass have a disability, as that term is defined in the ADA, and are entitled to the protections of the ADA.

236.    Title II of the ADA applies to all services, programs, and activities of public entities, including jails and prisons.  42 U.S.C. § 12132.  The Georgia

Department of Corrections and each of its officers must comply with Title II of the ADA.

237.   The ADA directed the Attorney General of the United States to promulgate regulations enforcing Title II of the ADA and provide guidance on their content.  42 U.S.C. § 12134.  The regulations that the Attorney General promulgated require public entities to "make reasonable modifications" to their programs and activities "when the modifications are necessary to avoid discrimination."  28 C.F.R. 35.130(b)(7).

238.   The regulations also specify that it is unlawful for a public entity to: (a) afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others; or (b) provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.  *See* 28 C.F.R. 35.130(b)(1)(ii) – (iii).

239.   Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal Financial Assistance."  29 U.S.C. § 794(a).

240.   Plaintiffs and the subclass members experience, are recorded as experiencing, and are regarded by Defendants as experiencing psychiatric disabilities that substantially limit one or more major life activities.

241.   Defendants deny important services, programs, and activities to Plaintiffs and others who experience psychiatric disabilities by placing them in GSP's segregation housing units solely by reason of their disabilities.  Defendants and the Georgia Department of Corrections receive federal funds in connection with those services, programs, and activities.

242.   Defendants have not permitted reasonable accommodations for Plaintiffs' disabilities and have discriminated against the individual Plaintiffs and class members in the provision of programs and services based upon their experiencing psychiatric disabilities.

243.   Plaintiffs seek declaratory and injunctive relief on behalf of themselves and a class of similarly situated persons to prevent further violations of their rights by Defendants.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully ask that this Court:

(1)   Assume jurisdiction over this action;

(2)   Certify this case as a class action under Rule 23 of the Federal Rules of Civil Procedure;

70

(3)  Declare that Defendants violated the Eighth Amendment rights of Plaintiffs and other class members;

(4)  Declare that Defendants violated the rights of Plaintiff Middleton and other members of the Psychiatric Disability Subclass under the Americans with Disabilities Act and the Rehabilitation Act;

(5)  Enter permanent injunctive relief against those Defendants sued in their official capacities, requiring Defendants to:

   (a) Offer at least four hours of daily out-of-cell time to all people in GSP's segregation housing units, including one hour per day of outdoor time;

   (b) Establish within 30 days a plan for providing meaningful activities and opportunities for social interaction to all people in GSP's segregation housing units, consistent with security concerns;

   (c) Establish within 30 days a plan to evaluate all people in GSP's segregation housing units to determine which people have serious mental illness, and promptly transfer such persons out of isolated confinement;

   (d) Establish within 30 days a plan to ensure that people who experience mental health crises receive prompt treatment and are housed in clean environments;

   (e) Establish within 30 days a plan to provide adequate sanitation, fix plumbing, electricity, and ventilation systems, and exterminate rodents and vermin in GSP's segregation housing units; and

   (f) Establish within 30 days a plan to ensure that the holding cages at GSP are used in a humane manner, and that persons are held in the cages for no longer than

reasonably necessary to ensure transport from one part of the prison to another.

(6)    Award Plaintiffs reasonable attorneys' fees, expenses, and costs of litigation under 42 U.S.C. § 1988 and other applicable law; and

(7)    Award such other and further relief as this Court deems just and proper.

Respectfully submitted, September 10, 2021.

James F. Bogan III (Ga. Bar 065220)
Tamara Serwer Caldas (Ga. Bar 617053)
C. Allen Garrett Jr. (Ga. Bar 286335)
Stephanie N. Bedard (Ga. Bar 825614)
Emilia Stromberg (Ga. Bar 896536)
Desmond M. Dennis (Ga. Bar 511943)
KILPATRICK TOWNSEND &
STOCKTON LLP
1100 Peachtree Street, NE, Suite 2800
Atlanta, Georgia 30309
(404) 815-6500
(404) 816-6555 (fax)
jbogan@kilpatricktownsend.com
tcaldas@kilpatricktownsend.com
agarrett@kilpatricktownsend.com
sbedard@kilpatricktownsend.com
estromberg@kilpatricktownsend.com
ddennis@kilpatricktownsend.com

/s/Ryan Primerano
Ryan Primerano (Ga. Bar 404962)
Alison Ganem (Ga. Bar 284894)
SOUTHERN CENTER FOR
HUMAN RIGHTS
60 Walton Street, NW
Atlanta, Georgia 30303
(404) 688-1202
(404) 688-9440 (fax)
rprimerano@schr.org
aganem@schr.org

*Counsel for Plaintiffs*